JOSEPH POLAK *et al.*, Plaintiffs-Appellants, v. ROLAND PERSON, Defendant (The Chicago Park District *et al.*, Defendants-Appellees).

First District (2nd Division)   No. 1—91—0717

Opinion filed July 28, 1992.

Sandman, Levy & Petrich, of Chicago (Robert R. Dlugajczyk, of counsel), for appellants.

Gessler, Flynn, Fleischmann, Hughes & Socol, Ltd., of Chicago (Terence E. Flynn, William P. Jones, and Kimberley Marsh, of counsel), for appellee Chicago Park District.

Kirkland & Ellis, of Chicago (Jeffrey S. Powell, of counsel), for appellee Skidmore, Owings & Merrill.

Schiff, Hardin & Waite, of Chicago (Paul M. Lurie, Joseph J. Krasovec III, and Edward J. Wong III, of counsel), for other appellees.

JUSTICE SCARIANO delivered the opinion of the court:

Joseph and Dorothy Polak (plaintiffs) appeal the trial court's October 23, 1990, order granting summary judgment in favor of Skidmore, Owings and Merrill (Skidmore), and Helmut Jahn, C.F. Murphy and Murphy/Jahn, Inc. (collectively, Murphy/Jahn), and its January 20, 1991, order granting summary judgment in favor of the Chicago Park District (District). Plaintiffs also appeal the trial court's February 26, 1991, denial of its motion to reconsider and clarify these orders.

In 1975, the architectural firms of Skidmore, Owings & Merrill, Murphy/Jahn, Inc., and Loebl, Scholssman, Dart and Hackl (Loebl) entered into a joint venture agreement after they were retained by the City of Chicago to design signs for Soldier Field as part of the Bicentennial Improvement Project. During the course of the project, they specified both the design and placement of the "Park Lot D" sign, which was constructed of steel and supported by two posts, each of which was embedded in a three-inch concrete base. The sign was located near the southbound lanes in the area of 1600 S. Lake Shore Drive, along a grassy area on the west shoulder of the road, lined with light poles and mature trees.[1]

On July 21, 1984, plaintiffs were traveling southbound on the straight stretch of Lake Shore Drive, in the vicinity of "Park Lot D," when Roland Person (Person), who was drag "racing with a late model Camaro" at a "high rate of speed," rammed the back of their vehicle while he was attempting to change lanes. The impact of the collision with Person's car caused plaintiff Joseph Polak to lose control of his vehicle, which swerved across two lanes of traffic, left the traveled portion of the roadway, went over a concrete barrier, into the grassy area, and collided with one of the "Park Lot D" sign's steel posts, which did not yield upon impact. Both plaintiffs were knocked unconscious by the impact of the collision with Person's car and neither recalled the secondary collision with the sign. As a result of these collisions, plaintiffs sustained serious personal injuries and extensive property damage to their vehicle. Person was later charged with making an unsafe lane change.

On October 4, 1984, plaintiffs filed a four-count complaint against Person, first amending it on January 13, 1986, to add the District as a defendant, alleging negligence in the placement of the sign. On July

---

[1] The record does not clearly state the distance of the sign from Lake Shore Drive, since it was removed prior to the initiation of this suit.

21, 1986, plaintiffs filed a second amended complaint, adding Skidmore and Murphy/Jahn, alleging negligence in the placement and design of the sign. Thereafter, on January 22, 1988, plaintiffs amended their complaint to include two counts sounding in negligence against Loebl, but these counts were later dismissed for failing to meet the requirements of the statute of limitations. The gravamen of plaintiffs' complaint is their contention that the sign should have been made with "break-away" posts and that the posts' concrete bases should have been smaller; had the sign been so designed, plaintiffs allege, they would have suffered little or no injuries attributable to their colliding with it.

On July 6, 1990, Skidmore filed a motion for summary judgment, asserting that it owed no duty to plaintiffs and that its conduct was not a proximate cause of their injuries. On July 20, 1990, later amended on August 27, 1990, Murphy/Jahn filed a motion for partial summary judgment, contending that the sign met the certain applicable design requirements and was therefore not too close to the roadway, that the concrete bases also met the design requirements, and that these bases did not, in fact, cause plaintiff's injuries. Thereafter, Skidmore was given leave to adopt Murphy/Jahn's motion as well. On October 10, 1990, the District filed a motion for summary judgment, making the same arguments as Skidmore and Murphy/Jahn. After hearing arguments of counsel on Skidmore's and Murphy/Jahn's motions, the trial court, on October 23, 1990, entered an order granting summary judgment in favor of both. On November 16, 1990, plaintiffs filed a motion for reconsideration and clarification, requesting the court to reverse its prior ruling, or alternatively, that it articulate its rationale in refusing to find the existence of a legal duty, pointing out that it had stated at the hearing:

> "It seems to me that the manner in which somebody uses the roadway, coming around the road at Soldier Field, is really not relevant to hitting the sign, because somebody can just skid on ice or skid on water and do the same thing that happened. I feel that within the realm of allowable foreseeability, that this could be foreseeable.
>
> ***
>
> Coming down Lake Shore Drive and jockeying for position in heavy traffic and going off the roadway, that's foreseeable.
>
> ***
>
> I already said that I think on the foreseeability issue I'm not going to go any further because I think there is foreseeability.

The only thing I'm going to take under advisement is the duty because I want to read the cases."

On January 20, 1991, the trial court heard the District's motion for summary judgment, and, based on its prior ruling of October 23, 1990, it granted the motion. On January 30, 1991, plaintiffs filed a motion, later consolidated with the November 16, 1990, motion, for reconsideration and clarification of the January 20, 1991, order. On February 26, 1991, the trial court denied plaintiffs' motions, finding that the October 23, 1990, order in favor of Skidmore and Murphy/Jahn was final,[2] and that there was no just reason to delay enforcement or appeal of the order, pursuant to Supreme Court Rule 304(a) (134 Ill. 2d R. 304(a)). On February 28, 1991, plaintiffs filed their notice of appeal.

## I

■ Since the parties are of two different thoughts on the subject, we address first the issue of what is the correct standard of review in the appeal of a motion for summary judgment. Two of the defendants, the District and Skidmore, claim that the proper standard is abuse of discretion, but this is emphatically not the case despite the fact that there are several appellate court cases holding to the contrary. (*Fearon v. Mobil Joliet Refining Corp.* (1984), 131 Ill. App. 3d 1; *Kemp v. Sisters of the Third Order of St. Francis* (1986), 143 Ill. App. 3d 360; *Alop v. Edgewood Valley Community Association* (1987), 154 Ill. App. 3d 482; *Lindenmier v. City of Rockford* (1987), 156 Ill. App. 3d 76.) Rather,

> "*[t]he sole function* of a reviewing court in reviewing the trial court's entry of a summary judgment is to determine whether the trial court correctly ruled that no genuine issue of material fact had been raised. [Citation.] If no such issue remained, then [the reviewing court] must determine whether judgment was correctly entered for the moving party as a matter of law." (Emphasis added.)

(*Coomer v. Chicago & North Western Transportation Co.* (1980), 91 Ill. App. 3d 17, 21; see also *Loyola Academy v. S & S Roof Maintenance, Inc.* (1992), 146 Ill. 2d 263, 272; *Derby Meadows Utility Co. v. Inter-Continental Real Estate* (1990), 202 Ill. App. 3d 345, 354; *Purtill v. Hess* (1986), 111 Ill. 2d 229, 240.) Neither the finding of an ab-

---

[2]The court's February 26, 1991, order does not state that the January 20, 1991, order in favor of the District was final, although the February 26, 1991, order is addressed in part to the District.

sence of a genuine issue of material fact nor the application of the correct rule of law to facts as to which there is no dispute can be said to require the exercise of discretion in any sense of the term.

## II

Regarding the merits of the appeal, the District asserts that the trial court was correct in holding that it did not owe plaintiffs a duty of ordinary care regarding either the design or placement of the sign. (*Gouge v. Central Illinois Public Service Co.* (1991), 144 Ill. 2d 535; *Boylan v. Martindale* (1982), 103 Ill. App. 3d 335; *Hoffman v. Vernon Township* (1981), 97 Ill. App. 3d 721.) Plaintiffs argue that the trial court erred in failing to find the existence of a legal duty after it had stated that it was foreseeable that "somebody can just skid on ice or skid on water and do the same thing that happened. I feel that within the realm of allowable foreseeability, that this could be foreseeable. *** I think there is foreseeability."

■ In order to state a cause of action for negligence, plaintiffs must allege that the defendant owes them a legal duty, that the defendant has breached this duty, and that the defendant's breach of this duty was the proximate cause of their injuries. (*Gouge*, 144 Ill. 2d at 542.)

"Whether a duty exists is a question of law to be determined by the court, and depends on whether the parties stood in such a relationship to one another that the law imposes an obligation on the defendant to act reasonably for the protection of the plaintiff. *** [T]he court will consider whether the risk of harm to the plaintiff was *reasonably foreseeable*." (Emphasis in original.) (*Gouge*, 144 Ill. 2d at 542.)

Although reasonable foreseeability of injury is a key concern in determining whether a duty exists, a court need also consider the likelihood of injury, the magnitude of the burden of guarding against it and the consequences of placing the burden on the defendant. *Gouge*, 144 Ill. 2d 535; *Kirk v. Michael Reese Hospital & Medical Center* (1987), 117 Ill. 2d 507, 525; *Lance v. Senior* (1967), 36 Ill. 2d 516, 518.

The controlling case in this instance is *Gouge*, in which Johnnie Gouge, one of the plaintiffs, lost control of his car as he approached a sharp curve in the road, skidded 65 feet, and eventually left the paved surface of the road. After careening across a gravel shoulder, his car struck a utility pole owned by the defendant. The pole was located approximately 15 feet from the edge of the paved surface of the road, and attached to the top of the pole was a 7,200-volt transformer filled with a flammable substance. Upon impact, the pole fractured approxi-

mately 10 to 12 feet above the ground, which caused the part of the pole containing the transformer to fall onto Gouge's automobile and through its windshield. The transformer broke open, causing the flammable substance to spill out, ignite, and severely burn and disable him. Johnnie and his wife Vicki filed a complaint basing it, in part, on negligence.

The defendant utility company argued that it was not reasonably foreseeable that Gouge would leave the roadway and strike this particular utility pole, and relying on *Boylan* and *Hoffman*, claimed that utility companies owe no duty to motorists in terms of the placement of utility poles because it is not reasonably foreseeable that a motorist in the ordinary course of travel would leave the traveled portion of the roadway and strike that utility pole. (*Gouge*, 144 Ill. 2d at 540.) The supreme court agreed, and citing *Boylan* and *Hoffman* with approval, stated that "it was not reasonably foreseeable that Gouge would strike this utility pole, [hence] we do not believe [defendant] owed a duty to plaintiffs to ensure that the pole would fall 'away from the roadway' when struck by Gouge's automobile." (*Gouge*, 144 Ill. 2d at 545.) The court, in holding for the defendant utility company, also went on to cite factors other than foreseeability, such as the "onerous and almost impossible burden" as well as the "staggering" "economic costs" that would be placed on the defendant if the court were to find the duty urged by the plaintiffs. *Gouge*, 144 Ill. 2d at 547.

■ In *Hoffman*, the plaintiff's decedent was killed when the vehicle which he was driving left the roadway and proceeded out of control for approximately 60 feet after striking a utility pole. In his complaint the plaintiff averred that the utility company was negligent in placing the pole in that location. Relying on the Restatement (Second) of Torts §368 (1965), regarding the liability of owners and occupiers of land for artificial conditions near a highway, the court noted that

> " '[a] possessor of land who creates or permits to remain *** [an] artificial condition so near an existing highway that he realizes or should realize that it involves an unreasonable risk to others accidentally brought into contact with such condition while traveling with reasonable care upon the highway, is subject to liability for physical harm thereby caused to persons who
>
> (a) are traveling on the highway, or
>
> (b) *foreseeably deviate from it in the ordinary course of travel.*' " (Emphasis added.) (*Hoffman*, 97 Ill. App. 3d at 725.)

The *Hoffman* court relied on official comment *g* to further note that:

" '[The rule] applies also to those who reasonably and expectably deviate from the highway and enter upon the abutting land in the ordinary course of travel.' ***

'In determining whether the condition is one which creates an unreasonable risk of harm to persons lawfully travelling on the highway and deviating from it, the essential question is whether it is so placed that travelers may be expected to come in contact with it in the course of a deviation reasonably to be anticipated in the ordinary course of travel.' " (*Hoffman*, 97 Ill. App. 3d at 725, quoting Restatement (Second) of Torts §368 (1965).)

The *Hoffman* court also noted that "duty is not bottomed on foreseeability alone" (*Hoffman*, 97 Ill. App. 3d at 724), but that there also existed a public policy approving of the placing of utility poles along highway right-of-ways. (*Hoffman*, 97 Ill. App. 3d at 727.) The court concluded that "it was [not] reasonably foreseeable to [the utility company that] under the facts here *** the decedent would deviate from the road as he did as a normal incident of travel." *Hoffman*, 97 Ill. App. 3d at 726.

In *Boylan*, the plaintiff sued the City of Elmhurst, Illinois Bell, and Commonwealth Edison for injuries incurred when the vehicle in which he was a passenger struck a wooden utility pole which was located near the intersection of North and Myrtle Avenues in that municipality. The plaintiff alleged that (1) the city was negligent in permitting placement of the pole in a dangerous position along North Avenue, and that (2) Illinois Bell and Commonwealth Edison breached their duties to operate, manage, maintain, and control the pole, and were negligent in placing it in a dangerous position along North Avenue. Relying upon *Hoffman* and section 368 of the Restatement, the court affirmed the trial court's dismissal of six of the counts of the plaintiff's fourth amended complaint, and its granting of summary judgment on another count, stating that " '[f]or a duty to attach the person must foreseeably deviate in the *ordinary course of travel.*' " (Emphasis in original.) (*Boylan*, 103 Ill. App. 3d at 344, quoting *Hoffman*, 97 Ill. App. 3d at 726.) The court went on to hold that

"[i]t is common knowledge that vehicles collide in roadways and on occasion leave the roadway and strike a utility pole or tree adjacent to the roadway. However, for a duty to third persons to be imposed upon those who erect and maintain such utility poles, there must be a reasonable anticipation of such deviation from the roadway as a normal incident of travel." *Boylan*, 103 Ill. App. 3d at 346.

■ Accordingly, if it is not reasonably foreseeable that a motorist will lose control of his car on a sharp curve, skid 65 feet, leave the paved portion of the roadway, and after crossing a gravel shoulder strike a utility pole loaded with a flammable substance 15 feet from the paved part of the road (*Gouge*, 144 Ill. 2d 535), neither can it be successfully contended that it is reasonably foreseeable that a motorist will be "rear-ended" on a straight stretch of road by a drag-racing "lane-jumper," causing the first motorist to lose consciousness and control of his vehicle, swerve over two lanes of roadway and leave it, go over a concrete barrier into a grassy area, and strike a sign post. Merely to state the proposition is to reach the obvious conclusion. We hold, therefore, that the trial court was correct in granting summary judgment in favor of the District, for we cannot agree that the District must be held to anticipate deviations from the roadway of the type that occurred in this case as a normal incident of travel.

"The question of whether a legal duty exists must also be analyzed in view of the public policy" interests at stake. (*Hoffman*, 97 Ill. App. 3d at 727.) It would be the sheerest form of tautology to say that the public has an interest in having necessary informational signs placed near highways so that motorists are able to easily see and heed them. For this reason as well we decline to impose a duty on the District.

### III

With respect to defendants Skidmore and Murphy/Jahn, plaintiffs argue that *Gouge, Boylan,* and *Hoffman* are inapposite to the factual situation before the court, since these cases pertain only "to the duty owed by one with a possessory interest in the land upon which the dangerous condition was placed," and not to the duty owed by an architect. Moreover, they claim, "this distinction is significant to the duty issue as set forth in Section 385 of the Restatement of Torts (Second)."[3]

---

[3]Section 385 provides as follows:

"One who on behalf of the possessor of land erects a structure or creates any other condition thereon is subject to liability to others upon or outside of the land for physical harm caused to them by the dangerous character of the structure or condition after his work has been accepted by the possessor, under the same rules as those determining the liability of one who as manufacturer or independent contractor makes a chattel for the use of others." Restatement (Second) of Torts §385 (1965).

Plaintiffs claim instead that *Miller v. De Witt* (1965), 59 Ill. App. 2d 38, *aff'd in part and rev'd in part and remanded* (1967), 37 Ill. 2d 273, sets forth the appropriate duty owed by architects: "An architect who plans and supervises construction work, as an independent contractor, is under a duty to exercise ordinary care in the course thereof for the protection of any person who foreseeably and with reasonable certainty may be injured by his failure to do so." (*Miller*, 59 Ill. App. 2d at 91.) In *Miller*, plaintiff construction workers were injured when the roof of the building on which they were working collapsed. Plaintiffs claimed that because the architects had taken responsibility both for the design of the building and for the supervision of the actual construction, they had "a duty to prevent the contractor from carrying out the work in a faulty manner." *Miller*, 37 Ill. 2d at 276.

"As a general rule it has been said that the general duty to 'supervise the work' merely creates a duty to see that the building when constructed meets the plans and specifications contracted for." (*Miller*, 37 Ill. 2d at 284.) In *Miller*, however, the court noted that the architects had agreed to do more than merely supervise the work, that "under the terms of the contracts the architects had the right to interfere and even stop the work if the contractor began to shore in an unsafe and hazardous manner ***[;] under the terms of these contracts the architects had the right to insist upon a safe and adequate use of that method." (*Miller*, 37 Ill. 2d at 284-85.) Because the architects had agreed to assume this additional burden, the court found that they took on an additional duty as well.

We find plaintiffs' reliance on *Miller* inapt. First, the duty imposed in *Miller* stemmed from the architects' having contractually undertaken the duty to intervene and stop work; no such undertaking is implicated here. Second, *Miller* imposes a duty on behalf of an architect "to exercise ordinary care *** for the protection of any person who *foreseeably and with reasonable certainty* may be injured by his failure to do so." (Emphasis added.) *Miller*, 59 Ill. App. 2d at 91.

We also find that plaintiffs' reliance on section 385 of the Restatement (Second) of Torts does not enhance their position. While they are correct in applying that provision to "one who designs" (*Johnson v. Equipment Specialists, Inc.* (1978), 58 Ill. App. 3d 133, 139), such application is not inconsistent with the result reached by the circuit court here. In *Ferentchak v. Village of Frankfort* (1984), 121 Ill. App. 3d 599, *aff'd in part, rev'd in part* (1985), 105 Ill. 2d 474, Robert Hamilton, a civil engineer, designed and oversaw construction of a subdivision in accordance with the applicable code requirements of the defendant village. His plans, however, lacked specifications as to foun-

dation levels for the homes and design criteria for drainage swales, and contained inadequate specifics for the grading of the subdivision. The plaintiff homeowners brought suit when they began to experience water problems in their new home and were unable to remedy the problems. In determining the issue of whether Hamilton's liability, as an independent contractor for the developer, terminated upon completion and acceptance of his work by the developer, the court noted an erosion of the doctrine of nonliability as set forth in *Paul Harris Furniture Co. v. Morse* (1956), 10 Ill. 2d 28,[4] and cited favorably *Hunt v. Blasius* (1978), 74 Ill. 2d 203, 208-09, which rejected the *Paul Harris* doctrine and substituted a "traditional negligence analysis as to duty." (*Ferentchak*, 121 Ill. App. 3d at 609.) The court, in acknowledging the provisions of section 385, utilized a "traditional tort analysis, focusing upon foreseeability of the injury \*\*\*, rather than artificial concepts such as privity" to determine the duty owed by Hamilton. *Ferentchak*, 121 Ill. App. 3d at 609.

Moreover, comment *c* of section 385 supports an application of "traditional tort analysis," noting that the "manufacturer of a chattel \*\*\* is subject to liability for bodily harm caused to persons who *may be expected* to use it[,] \*\*\* to all persons whom he *should expect* to be upon the land with the consent of his employer or to be in its vicinity." (Emphasis added.) (Restatement (Second) of Torts §385, comment *c*, at 294 (1965).) In determining whether it was reasonably foreseeable that plaintiffs would be injured under the circumstances we encounter here, we find that *Gouge, Boylan* and *Hoffman* provide the necessary tests, the same tests that were applied to the District. Accordingly, for the same reasons discussed above with respect to the District, we hold that Skidmore and Murphy/Jahn owed no duty to plaintiffs.

---

[4]The general rule is that where an independent contractor is employed to construct or install any given work or instrumentality, and has done the same and it has been accepted by the employer and the contractor discharged, he is no longer liable to third persons for injuries received as the result of defective construction or installation. (*Empire Laundry Machinery Co. v. Brady*, 164 Ill. 58.) This rule, however, is subject to certain well recognized exceptions whereby a contractor may be held liable even after acceptance of his work by the contractee (1) where the thing dealt with is imminently dangerous in kind, such as explosives, poisonous drugs, and the like, (2) where the subject matter of the contract is to be used for a particular purpose, requiring security for the protection of life, such as a scaffold, and (3) where the thing is rendered dangerous by a defect of which the constructor knows but deceitfully conceals, and which causes an accident when the thing is used for the particular purpose for which it was constructed." *Paul Harris*, 10 Ill. 2d at 40.

## IV

■ Plaintiffs further make the argument that defendants implicitly violated the Illinois Vehicle Code (III. Rev. Stat. 1985, ch. 95½, par. 11—301)[5] by not ensuring that the sign in question was in conformity with the manual on Uniform Traffic Control Devices for Streets and Highways (manual). We find this argument to be meritless. Plaintiffs suggest that defendants' violation of the Motor Vehicle Code consisted of their not replacing the sign with one made of a "break-away" design, which, they allege, was required by the manual. The statute itself, however, clearly and unmistakably exempts from its coverage, during their useful lives, nonconforming signs in use prior to January 1, 1985. Clearly the "Park Lot D" sign was in use prior to January 1, 1985, and plaintiffs make no argument that the sign had outlived its useful life. Thus, even if the sign were nonconforming, it was exempt from the coverage of the statute.

Accordingly, for all of the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

HARTMAN, P.J., and McCORMICK, J., concur.

---

[5]The section provides as follows:

"Department to adopt sign manual. The Department shall adopt a State manual and specifications for a uniform system of traffic-control devices consistent with this Chapter for use upon highways within this State. Such manual shall include the adoption of the R 7-8 sign adopted by the United States Department of Transportation to designate the reservation of parking facilities for the handicapped. *Non-conforming signs in use prior to January 1, 1985 shall not constitute a violation during their useful lives, which shall not be extended by other means than normal maintenance.* The manual shall also specify insofar as practicable the minimum warrants justifying the use of the various traffic control devices. Such unform system shall correlate with and, where not inconsistent with Illinois highway conditions, conform to the system set forth in the most recent edition of the national manual on Uniform Traffic Control Devices for Streets and Highways." (Emphasis added.) Ill. Rev. Stat. 1985, ch. 95½, par. 11—301.