No. 1-02-1408 FIRST DIVISION

May 5, 2003

THE PEOPLE 
ex rel.
 THE DEPARTMENT OF ) Appeal from the 

LABOR, ) Circuit Court of

) Cook County.

Plaintiff-Appellant, ) 

)

v. ) No. 01 L 3189

) 

MCC HOME HEALTH CARE, INC., an Illinois )

Corporation, and EDUARDO CORTEZ, Indiv. and )

in His Official Capacity as President, ) The Honorable

) Paddy H. McNamara,

Defendants-Appellees. ) Judge Presiding.

PRESIDING JUSTICE GORDON delivered the opinion of the court:

Following an informal investigative conference, plaintiff-appellant the People of the State of Illinois 
ex rel.
 Illinois Department of Labor (Department), concluded that nurses working for defendants-appellees MCC Home Health Care, Inc. (MCC) and Eduardo Cortez were employees rather than independent contractors.  The Department ordered MCC and Cortez to pay the nurses back overtime pursuant to the Illinois Minimum Wage Law (Act) (820 ILCS 105/4(a)
 (West 2000)) in the amount of $193,560.46
.  MCC and Cortez withheld payment, and the cause proceeded to trial.  The trial court disagreed with the findings of the Department and entered an order granting summary judgment to MCC and Cortez, concluding that the nurses were independent contractors and not employees entitled to overtime pay pursuant to the Act.  The Department appeals from the trial court's grant of summary judgment in favor of MCC and Cortez, asking that we reverse the court's order and remand the cause for further proceedings.  For the following reasons, we reverse and remand.

BACKGROUND

MCC is a nursing referral agency that contracts with the State of Illinois, the Illinois Department of Public Aid and the University of Illinois Division of Specialized Care for Children (collectively, the State) to place pediatric nurses in private patient homes to administer home health care.  Cortez is the president of MCC, but is not a health care professional.  The State reimburses MCC according to the hours its nurses work, and MCC in turn pays the nurses a set hourly rate, taking into consideration its overhead costs.  

In 1999, the Department began an investigation based on allegations that MCC and Cortez were in violation of section 4(a) of the Act
, which mandates that employers pay their employees a rate of time and one-half their regular hourly wage for hours worked in excess of 40 hours per week.  See 820 ILCS 105/4(a)
 (West 2000). The allegations asserted that between July 1996 and September 1998, MCC and Cortez failed to pay overtime wages to the 65 nurses on its referral roster.  A compliance officer from the Department conducted an inspection of MCC's time sheets and pay books and concluded in his audit that MCC and Cortez had violated the Act and were required to pay a total of $193,560.46 in back overtime pay.    

On September 23, 1999, an informal investigative conference was held before a Department hearing officer to obtain further evidence and identify the issues in dispute.  Although a transcript of that hearing is not included in the record on appeal, the hearing officer's written determination, issued on December 23, 1999, reveals the following.  

At the hearing, Cortez testified on behalf of MCC with respect to its daily operations, asserting that the nurses that work for MCC are independent contractors, not employees, and thus, he is not required to pay them overtime pursuant to the Act.  In support, Cortez stated that the nurses on MCC's referral roster are free to accept or decline an assignment and that a patient's parent or guardian can accept or decline a specific nurse.  Cortez also stated that the nurses record the time they work, and MCC verifies the time and pays the nurses an hourly rate.  The nurses maintain their own hours and neither MCC nor Cortez tells the nurses how to perform their duties at the patients' homes.  He did state, however, that MCC visits the homes to see if the patient and parent or guardian are satisfied with the services rendered.  Cortez testified that these visits are conducted when the assigned nurse is not present at the home.  Cortez stated that each nurse is responsible for maintaining his or her own licensing and must provide his or her own uniform.  Cortez further testified that nurses do not stay with MCC for "a long time" and that there is no exclusive employment relationship between MCC and the nurses.  

Ila Rubens, a nurse who worked for MCC and Cortez, also testified at the Department's informal hearing.  She stated that she worked full time for MCC and was paid on an hourly basis.  She testified that she was assigned to a supervisor and was told that if she had any problems, she was to seek assistance from that supervisor.  Rubens also testified that while she was free to choose her assignments, she worked with only one family for over a two-year period.  As for her supplies, Rubens testified that although she received the majority of her nursing supplies from the State, MCC told her what supply company to contact if she needed any other supplies.  Rubens also stated that MCC had paid her for vacation time in the past, and she had received an "employee manual."

In its written decision, the Department hearing officer determined that the issue was whether the nurses are employees of MCC, and thereby eligible for overtime pay under the Act, or independent contractors, and thereby exempt from receiving overtime pay under the Act.  The hearing officer cited section 210.110 of the Illinois Administrative Code (Code) and stated that the Department's regulations under this Code section concerning the Act require the use of the following six-part test to determine whether an individual is an employee or an independent contractor:

"The Director [of the Department] will consider the following factors as significant when determining whether an individual is an employee or an independent contractor: 

[(1)] the degree of control the alleged employer exercised over the individual; 

[(2)] the extent to which the services rendered by the individual are an integral part of the alleged employer's business; 

[(3)] the extent of the relative investments of the individual and alleged employer; 

[(4)] the degree to which the individual's opportunity for profit and loss is determined by the alleged employer; 

[(5)] the permanency of the relationship; 

[and (6)] the skill required in the claimed independent operation."  56 Ill. Adm. Code §210.110 (1996).

The hearing officer applied this test, reviewing each of the six factors with respect to the evidence presented.  The hearing officer found that the first and sixth factors indicated an independent contractor status because MCC and Cortez do not control the nurses in the performance of their work and because MCC and Cortez require the nurses to maintain their own licensing on an independent basis.  However, the hearing officer concluded that the second, third and fourth factors favored an employee-employer relationship: because MCC refers only nurses and no other professionals, the nurses' health care services are "integral" to MCC's business; because the nurses do not have to "expend monies" to purchase supplies, they do not have financial control; and because the nurses lack financial control and are paid hourly, MCC controls their opportunity for profit and loss.  As for the fifth factor, the hearing officer found this to be neutral because of a lack of conclusive evidence.  The hearing officer also addressed the additional information provided by Rubens about receiving paid vacation and an employee manual and found that this evidence was not indicative of the nurses' status with respect to MCC.  In her conclusion, the hearing officer stated that "since 3 of the 6 factors supported [an] employer-employee relationship, one factor was neutral *** and 2 factors supported an independent contractor association," the compliance officer's findings that the nurses are employees and, as such, fall under the overtime pay requirements of the Act should be upheld.

MCC and Cortez held back payment of the $193,560.46 sum upheld by the Department hearing officer.  On March 15, 2001, pursuant to section 12(b) of the Act, the Department filed a complaint at law against MCC and Cortez
.  See 820 ILCS 105/12(b) (West 2000).  MCC and Cortez filed their answer, asserting that the nurses were not employees under the Act but, rather, independent contractors.  MCC and Cortez thereupon moved for summary judgment,
(footnote: 1) alleging that the Department's hearing officer should have applied the common law "right of control" test, rather than the six-part test pursuant to the Code, to determine whether the nurses are employees or independent contractors.  

In support of their motion for summary adjudication, MCC and Cortez attached a copy of the hearing officer's written decision and an affidavit from Cortez.  Cortez's affidavit restated much of the testimony he gave at the informal investigative conference, but also included the following new details.  Cortez stated that the nurses on MCC's referral roster do not have to work any specific amount of hours to remain on the roster and may remove their names from the roster whenever they wish.  MCC does not send other nurses or health care professionals to the patients' homes to supervise the nurses, and while the nurses may create patient notes, they are not required to submit any kind of oral or written report to Cortez or MCC.  Moreover, while MCC maintains a place of business as an office staffed by in-house employees, the nurses do not work there.  Cortez also explained in his affidavit that the nurses are expected to provide their own "tools of the trade, such as uniforms, lab coats, stethoscopes, blood pressure cuffs, and nursing shoes."  In addition to providing their own professional liability insurance, the nurses also pay their own transportation costs for their patient visits and their own continuing education costs to maintain their licenses.  Cortez also stated that MCC provides no supplies or equipment to the nurses, and that the nurses are free to order whatever supplies they need from the State's authorized supplier.  Finally, Cortez stated in his affidavit that MCC "has no exclusive relationship" with any of the nurses it refers, and all or most of the nurses are also under contract with other home health care agencies or hospitals, or work with more than one patient at a time.  

The trial court granted MCC and Cortez's motion for summary judgment on March 26, 2002, and issued its written memorandum and order on April 10, 2002.  In its written order, the court stated that, contrary to MCC and Cortez's argument, the proper test to determine independent contractor status is the six-part test articulated by the Department's hearing officer pursuant to the Code.  However, upon examining each of the six factors, the court found that, contrary to the hearing officer's determination, four of the six factors favored independent contractor status.  The court agreed with the hearing officer's findings that factor (1) (degree of control) and factor (6) (skill) supported an independent contractor relationship.  But, the court also held that the evidence presented clearly showed that factor (3) (extent of investment) and factor (5) (permanency of relationship) also supported an independent contractor relationship, since the nurses supply their own equipment, tools and uniforms and since the nurses choose their own hours and assignments and do not have an exclusive employment relationship with MCC.  

The court further stated that were it to apply the common law right of control test as proposed by MCC and Cortez, its conclusion that the nurses are independent contractors would not change.  The court determined that the primary factor pursuant to that test is whether the employer has a right to control the actions of the worker.  The court held that because MCC and Cortez do not train or instruct the nurses, do not tell the nurses how to perform their duties and do not have exclusive control over the nurses' daily activities or employment opportunities, MCC and Cortez do not have a right to control the nurses, and thus, the nurses would be independent contractors under the common law test as well.

Accordingly, the court granted MCC and Cortez's motion for summary judgment, holding that under the six-part test of section 210.110 of the Code, or even under the common law right of control test, the evidence "strongly supported" the nurses' status as independent contractors, excluding them from the overtime pay requirement of the Act.

ANALYSIS

The Department's primary contention on appeal is that the trial court erred in granting summary judgment because there are unresolved questions of material fact despite the court's determination that the evidence "strongly favored" a finding of independent contractor status.  MCC and Cortez, meanwhile, contend on appeal that the trial court should have used the common law right of control test, rather than the six-part test, as the basis for concluding that there are no questions of material fact in this cause.  MCC and Cortez also contend, however, with apparently less enthusiasm, that even under the six-part test, summary judgment was proper because the evidence clearly supports a finding of independent contractor status with respect to each of the six factors.

As a threshold matter, we first clarify the appropriate standard of review for this appeal, as the parties assert different standards in their briefs.  The Department claims that our review from the trial court's grant of summary judgment should be 
de novo
, while MCC and Cortez rely on the case of 
Fearon v. Mobil Joliet Refining Corp.
, 131 Ill. App. 3d 1, 5 (1984), for the proposition that our review should be on an abuse of discretion basis
.  
Fearon
 does state that a trial court's grant of summary judgment should not be reversed absent a showing of abuse of discretion.  See 
Fearon
, 131 Ill. App. 3d at 5.  However, we note that this portion of the 
Fearon
 decision has been severely criticized by the majority of our courts, which have declined to follow it in favor of a 
de novo
 standard.  See 
Polak v. Person
, 232 Ill. App. 3d 505, 509 (1992) (and cases cited therein concluding that an abuse of discretion standard of review for grants of summary judgment "is emphatically not the case despite the fact that there are several appellate court cases holding to the contrary"); accord 
Arra v. First State Bank & Trust Co. of Franklin Park
, 250 Ill. App. 3d 403, 406 (1993); see also 
Meyer v. Cohen
, 260 Ill. App. 3d 351, 359 n.3 (1993) (reviewing the recent criticism of those appellate court decisions, including 
Fearon
, that apply an abuse of discretion standard in reviewing appeals in summary judgment cases).  Accordingly, we too decline to follow 
Fearon
 and reemphasize the well-settled law long espoused by our state supreme court that our review on appeal from a grant of summary judgment is 
de novo
.  See 
Morris v. Margulis
, 197 Ill. 2d 28, 35 (2001); 
Outboard Marine Corp. v. Liberty Mutual Insurance Co.
, 154 Ill. 2d 90, 102 (1992); 
Purtill v. Hess
, 111 Ill. 2d 229, 240 (1986).  

The purpose of summary judgment is to determine whether a question of material fact exists.  See 
Addison v. Whittenberg
, 124 Ill. 2d 287, 294 (1988).  While summary judgment provides an expeditious disposition of lawsuits, it "must be awarded with caution" to avoid preempting a party's right to a trial by jury or its right to present the factual basis of its cause.  
Schrager v. North Community Bank
, 328 Ill. App. 3d 696, 703 (2002).  Therefore, summary judgment is proper only if the pleadings, depositions, and admissions on file, together with any affidavits and exhibits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  See 
Morris
, 197 Ill. 2d at 35.  The trial court must construe these documents strictly against the movant and may only grant summary judgment if the documents show that the movant's right to relief is clear and free from doubt.  See 
Morris
, 197 Ill. 2d at 35.  If a dispute as to a material fact exists or if reasonable minds may differ with respect to the inferences drawn from the evidence, summary judgment cannot stand.  See 
Schrager
, 328 Ill. App. 3d at 703; accord 
Morris
, 197 Ill. 2d at 35
.

Substantively, we first address the contentions raised by the parties on appeal with respect to which test, the six-part test found in the Code or the common law right of control test, is the proper test to apply in the determination of whether an individual is an employee or an independent contractor within the context of the Act
.  Section 210.110 of the Code states that for purposes of determining whether an individual is an employee or an independent contractor under the Act:

"The Director [of the Department] will consider the following factors as significant *** :

[(1)] the degree of control the alleged employer exercised over the individual; 

[(2)] the extent to which the services rendered by the individual are an integral part of the alleged employer's business; 

[(3)] the extent of the relative investments of the individual and alleged employer; 

[(4)] the degree to which the individual's opportunity for profit and loss is determined by the alleged employer; 

[(5)] the permanency of the relationship; [and]

[(6)] the skill required in the claimed independent operation."  56 Ill. Adm. Code §210.110 (1996).

Pursuant to this six-part test, the "common law standard relating to master and servant *** [is] not dispositive.  Rather, it is the total activity or situation which is controlling."  56 Ill. Adm. Code §210.110 (1996).  In contrast, the common law right of control test propounds that the principal factor used in determining whether an individual is an employee or an independent contractor is the employer's right of control; if the employer has the right to control the manner and method in which the work is to be carried out, then the individual is an employee rather than an independent contractor.  See 
Gunterberg v. B&M Transportation Co.
, 27 Ill. App. 3d 732, 738 (1975).  However, in addition to this principal factor under the common law, other "secondary" factors may be applied to aid in the determination of a worker's status, including skill, method of payment, right to discharge and the furnishing of the tools to be used.  See 
Gunterberg
, 27 Ill. App. 3d at 738, relying on 
Henn v. Industrial Comm'n
, 3 Ill. 2d 325, 327 (1954) ("all these and other factors enter into the determination"). 
 

In this case, MCC and Cortez assert that the common law test is the proper test to apply because the six-part Code test is in derogation of the common law and, thus, is not a "valid interpretation" of the Act, which must be read strictly with respect to the scope of its coverage.  In support of their argument, they cite several cases espousing the general principles that statutes in derogation of the common law are to be read narrowly and that the common law is not to be abrogated unless it clearly appears that this is the intent of the statute at issue.  See generally 
DeWig v. Landshire, Inc.
, 281 Ill. App. 3d 138 (1996); 
People v. Maggi
, 310 Ill. App. 101 (1941); 
Lites v. Jackson
, 70 Ill. App. 3d 374 (1979).  However, the cases cited by MCC and Cortez in support of their contention are cases in which the courts approached a provision at issue in a statute without that provision first having been subject to an interpretation by the administrative agency charged with enforcing the statute.  See 
DeWig
, 281 Ill. App. 3d at 142 (court specifically noting that term at issue was defined in statute and not in any administrative regulation); 
Maggi
, 310 Ill. App. at 103-04 (court looked to statutory act which defined term at issue, as no regulation defining the term existed); 
Lites
, 70 Ill. App. 3d at 375 (because term at issue was defined in statutory act, court reviewed only this act).  This is not the situation presented in the instant case.  Here, we are called on to consider the validity of an agency's own interpretation as to the scope of the enabling provision of the statute which authorizes that agency to promulgate regulations to implement the provisions of the statute.  This invokes other principles of statutory construction which must also be considered in that context.  For the reasons discussed below, we see no compelling reason to challenge the Department's interpretation of the Act pursuant to which it found a clear mandate to expand the employee test to embrace six factors and to place all six factors on an equal basis.  Accordingly, we agree with the Department that the Code test is the proper test to apply in the instant case.

Our law is clear that administrative regulations, while not binding, are entitled to enhanced acknowledgement and respect from our courts.  See 
Lauer v. American Family Life Insurance Co.
, 199 Ill. 2d 384, 388 (2002) (interpretation of statute by agency charged with the administration and enforcement of that statute must be given substantial deference); accord 
Craftmasters, Inc. v. Department of Revenue
, 269 Ill. App. 3d 934, 941 (1995).  These regulations "have the force and effect of law, and must be construed under the same standards which govern the construction of statutes."  
Union Electric Co. v. Department of Revenue
, 136 Ill. 2d 385, 391 (1990).  Thus, administrative regulations are presumed to be valid and we are to give effect to each word used.  See 
Northern Illinois Automobile Wreckers & Rebuilders Ass'n v. Dixon
, 75 Ill. 2d 53, 58 (1979); 
People 
ex rel.
 Colletti v. Pate
, 31 Ill. 2d 354, 359 (1964).

The manifest purpose of the Act is to secure that employers pay a standard minimum wage and overtime to employees at a level consistent with the employees' health, efficiency and general well-being.  See 820 ILCS 105/2 (West 2000).  While the legislature provided a general definition of the term "employee" as the protected class under the Act (820 ILCS 105/3(d) (West 2000)), the legislature also expressly granted the Director of the Department the power to "make and revise administrative regulations, including definitions of terms, as he deems appropriate to carry out the purposes of this Act."  820 ILCS 105/10 (West 2000).  Thus, the Act is clear in granting to the Director of the Department the discretion to evaluate and to ascertain the purposes of the Act and to promulgate regulations that fully enforce those ascertained purposes.  See 820 ILCS 105/10 (West 2000).  We note that the common law, on which MCC and Cortez would have us focus, has never defined the term "employee" for purposes of ascertaining who should be protected by minimum wage and overtime standards, since there is no indication that such a question was ever the subject of any common law regulation.  The common law, then, provides us with little guidance in ascertaining the intended scope of the legislature in defining the classes to be protected.  Thus, there is no reason to limit the scope of the Act solely to the dominance of the control test and restrict its expansion to embrace wage earners who are otherwise primarily, if not solely, dependent upon a given employer for their jobs and their livelihoods.  Each of the six factors under the regulation, in turn, searches out a characteristic regarding employment status which rationally may enter into a determination that would impact an individual's entitlement to the statute's protections under its general purposes.  Therefore, none of the six factors under the Code test are arbitrary, unreasonable or inconsistent with the defined general purposes of the statute.  See
 
Craftmasters, Inc.
, 269 Ill. App. 3d at 941 (giving force and effect to administrative regulation as promulgated in the Code, finding that it was not arbitrary or unreasonable or inconsistent with statute at issue);
 
Union Electric Co.
, 136 Ill. 2d at 391-92 (upholding validity of tax regulation as promulgated by agency in Code, and affording it full force and effect of law in conjunction with statutory tax act).  

 We further note that a review of the common law right of control test itself, as compared to the six-part Code test, demonstrates that the two tests, contrary to MCC and Cortez's contention, are not in full conflict or in full derogation of each other.  There is no language in section 210.110 that eliminates the common law right of control test.  In point of fact, section 210.110 states that the first factor to be considered when determining whether an individual is an employee or an independent contractor is the "degree of control" exercised over the individual by the alleged employer.  56 Ill. Adm. Code §210.110 (1996).  Thus, the Code test incorporates the common law test, but only as a significant factor among five others to be considered.  Our courts have recognized that even under the common law, while the element of control is the preeminent factor in determining an individual's employment status, "various secondary tests" may also be applied to aid in this determination.  
Gunterberg
, 27 Ill. App. 3d at 738; see also 
Henn
, 3 Ill. 2d at 327.  These secondary tests, which include the method of payment, the right to discharge the individual, the skill required in the work to be done and who provides the tools, materials and equipment used by the individual, are to be "measured against the totality" of the circumstances presented.  
Gunterberg
, 27 Ill. App. 3d at 738.  These secondary tests track the language used in the Code test.  Compare 
Gunterberg
, 27 Ill. App. 3d at 738 (discussing the common law secondary tests), with 56 Ill. Adm. Code §210.110 (1996) (requiring a totality of the circumstances approach).  The difference is the weight to be assigned to the right of control test itself.  The factors present in the Code test play a part in defining who is to fall within the scope of protection afforded under the Act, as interpreted by the Director pursuant to his express powers under that statute to make and revise regulations as he deems appropriate.  See 820 ILCS 105/10 (West 2000).  Thus, again, we cannot conclude that the administrative determination of the Director's mandate under the Act is arbitrary, unreasonable or inconsistent in fulfilling the overall purpose of the statute.

Having determined that section 210.110's six-part test was the proper test to apply in the instant case, we now turn to a review of the propriety of the trial court's grant of summary judgment based on its application of that test.  As previously noted, the trial court held that the weight of the evidence "strongly" favored an independent contractor status for the nurses that work for MCC and Cortez.  However, the court did not evaluate each of the six factors listed in section 210.110 of the Code.  Rather, the trial court based its decision on only four of the factors: (1) degree of control, (3) extent of investment, (5) permanency of relationship and (6) skill.  It did not evaluate the effect of factors (2) (extent to which services rendered by individual are an integral part of the alleged employer's business) and (4) (degree to which individual's opportunity for profit and loss is determined by the alleged employer) with respect to the relationship between MCC and the nurses.  

As more fully discussed below, while the court found that four factors favored a conclusion of independent contractor status, with respect to each of these factors, that conclusion was neither categorical nor absolute, but rather, merely a balancing of the factors themselves.  Upon our review, we find that there is sufficient countervailing evidence with respect to these four factors that, when coupled with the court's failure to address factors (2) and (4), create genuine issues of material fact.  

Our review of the record indicates that the evidence presented before the trial court during the motion for summary judgment with respect to factor (2) (extent to which the individual is an integral part of the employer's business), which the court did not address, clearly favored a finding of employee status, since there can be no question that these nurses were integral insofar as MCC functioned exclusively as a referral service for nurses.  Although our courts have not specifically defined "integral part" of the employer's business, they have provided some guidance with respect to this term.  For example, in 
Carpetland U.S.A., Inc. v. Illinois Department of Employment Security
, 201 Ill. 2d 351, 384 (2002), our supreme court was called upon to review a report from an administrative agency which concluded that certain workers were employees and not independent contractors under the Unemployment Insurance Act (820 ILCS 405/100 
et seq.
 (West 2000)).  The agency's report stated that the workers' services were "an integral part" of the employer's business.  
Carpetland U.S.A., Inc.
, 201 Ill. 2d at 384.  In reviewing this portion of the report, our supreme court stated that the "key to this inquiry is whether the [workers'] services are necessary to the business" of the employer "or merely incidental."  
Carpetland U.S.A., Inc.
, 201 Ill. 2d at 386.  From this, the court concluded that if it could be said that "but for" the workers' services the employer would go out of business, then the workers' services were integral to the employer's business.  
Carpetland U.S.A., Inc.
, 201 Ill. 2d at 386, relying on 
Murphy v. Daumit
, 387 Ill. 406, 417 (1944) (finding that services of sales representatives (
i.e.
, conducting sales calls) are "in usual course of business" and thus integral to employer who is in the business of selling the product), and 
O'Hare-Midway Limousine Service, Inc. v. Baker
, 232 Ill. App. 3d 108, 113 (1992) (finding that services of chauffeurs are in usual course of business and thus integral to employer who is in business of dispatching limousines, since the act of driving is necessary to that business).  A similar analysis of the term "integral part" of the employer's business was also developed in 
Blessing/White, Inc. v. Zehnder
, 329 Ill. App. 3d 714, 723 (2002).  There, in determining whether an asset could be deemed an integral part of a company's business, the court looked to whether the asset generated income for the company during the period in which the asset was used.  See 
Blessing/White, Inc.
, 329 Ill. App. 3d at 723.  

The federal case of 
Brock v. Superior Care, Inc.
, 840 F.2d 1054 (2d Cir. 1988), which is factually similar to the instant case, also reviewed the term "integral part" of the employer's business.  There, the Secretary of Labor brought an action against a nursing referral service alleging violation of the overtime pay provisions of the federal Fair Labor Standards Act (29 U.S.C. §201 
et seq.
 (1988)).  Upon review, the court was required to determine whether the nurses were employees or independent contractors, and applied a five-part test similar to the six-part test found in section 210.110 of the Code used by the trial court here.  Like the six-part test, one factor in the federal five-part test was the extent to which the nurses' work was "an integral part" of the referral services' business.  Although there was no specific definition of this term, the court looked to the "importance of the nurse[s'] role" in evaluating this factor.  
Brock
, 840 F.2d at 1059.  Upon its review, the court concluded that the nurses' services were "integral" because the referral agency's business was to provide health care personnel on request–
i.e.
, to provide the nurses themselves.  See 
Brock
, 840 F.2d at 1059.  Thus, this factor "amply supported" a conclusion that the nurses were employees, rather than independent contractors.  
Brock
, 840 F.2d at 1059-60.  

In the instant case, the evidence presented before the trial court on summary judgement showed that MCC was a nursing referral agency that contracted with the State to provide home health care to pediatric patients.  In essence, the State used MCC's services to place nurses in patients' homes.  The State compensated MCC at a set rate according to the amount of hours the nurses MCC placed actually worked.  Thus, MCC's profits were directly related to the services rendered by the nurses.  This demonstrates that the nurses not only generated income for MCC and Cortez, but comprised the business' primary source of income.  See 
Blessing/White, Inc.
, 329 Ill. App. 3d at 723.  Moreover, although Cortez stated in his affidavit that he is not a health care professional, he did state that he is in the business of providing nursing services at the behest of the State for patient-customers.  It can be reasonably concluded from this that the nurses' services were necessary to the survival of MCC and Cortez; but for the nurses' services, MCC and Cortez would have no patient-customers and, thus, would receive no compensation from the State.  See 
Carpetland U.S.A., Inc.
, 201 Ill. 2d at 386.  Also, the evidence is clear that MCC and Cortez referred only nurses and no other professionals of any kind.  MCC and Cortez are not simply in the business of referring professionals.  Rather, they are in the business of providing health-care nurses on request.  See 
Brock
, 840 F.2d at 1059.  It can be concluded, then, that the nurses are so necessary to MCC and Cortez's business that they form an "integral part" thereof.

 The trial court below also failed to consider factor (4) of the six-part Code test, namely the degree to which the individual's opportunity for profit and loss is determined by the alleged employer, in its determination of whether the nurses are employees or independent contractors.  A review of the evidence presented on summary judgment with respect to this factor reveals that a genuine issue of material fact exists as to whether it supports a finding of employee status or independent contractor status.

Again, our courts have not specifically explained what elements we are to consider when examining the degree to which an alleged employer's control over an individual's opportunity for profit and loss determines the individual's status as an employee or an independent contractor.  However, we do find some guidance in comparable case law that has examined opportunity for profit and loss.  For example, the 
Brock
 court addressed this factor, albeit in the context of the federal five-part employee-independent contractor test, with respect to facts similar to those of the instant case.  The court noted that the nurses involved were placed on a roster by the referral service and were assigned to jobs from this roster.  Patients using the service contracted with the service, not with the nurses, and the nurses were barred from entering into any kind of private pay arrangement with the patients.  The service paid the nurses a set hourly wage, which the service determined upon consideration on market conditions.  Based on this economic interdependence, the court concluded that the nurses had no opportunity for profit and loss, and thus, were employees of the referral service.  See 
Brock
, 840 F.2d at 1059.

Similarly, in
 
AFM Messenger Service, Inc. v. Department of Employment Security
, 198 Ill. 2d 380, 396-97 (2001), our supreme court was called upon to determine whether an individual was an employee or independent contractor for purposes of the Unemployment Insurance Act.  One of the factors our supreme court looked to was the economic relationship between the alleged employer, a messenger service, and the individuals, the delivery drivers.  
In so doing, the court noted that the service procured the customers, set the delivery prices, made the delivery assignments, billed the customers, set the commission rate and paid the drivers.  See 
AFM Messenger Service, Inc.
, 198 Ill. 2d at 401.  In effect, the service determined whether the drivers worked and, thus, whether they made money.  This evidence demonstrated that the drivers and the service had a dependent economic relationship, indicative of employer-employee status.  See 
AFM Messenger Service, Inc.
, 198 Ill. 2d at 401-02, relying on 
Daumit
, 387 Ill. at 416-17 (vacuum cleaner salesmen were not independent contractors engaged in independent enterprise even though they received commission, since they did not enjoy economic independence due to employers' right to set the price of vacuums and credit terms for customers), and 
Jack Bradley, Inc. v. Department of Employment Security
, 146 Ill. 2d 61, 80-81 (1991) (food demonstrators were not independent contractors since demonstration company retained all proprietary interests in business).

In the instant case, the evidence established that MCC placed the nurses in those positions that were open; thus, the nurses could only work with those patients to which MCC assigned them.  The evidence is also undisputed that MCC, and not the patients, paid the nurses an hourly rate as established by MCC, and that MCC was in charge of assigning which nurses on the roster worked and which did not work on any given day.  This evidence indicates that MCC determined the nurses' opportunity for profit and loss.  Thus, factor (4) would clearly militate toward a finding of employee status, rather than independent contractor status.  

Finally, in addition to the trial court's failure to address factors (2) and (4), we find that the evidence presented at the motion for summary judgment created genuine issues of material fact with respect to factors (1), (3), (5) and (6) of the Code's six-part test.  As for factor (1) (the degree of control the alleged employer exercised over the individual), we note that the trial court found that the evidence supported independent contractor status because MCC does not train the nurses, the nurses are free to decline assignments and there is no exclusive employment relationship between MCC and the nurses.  However, there was evidence presented countermanding this finding.  For example, although the nurses can decline an assignment, there is no evidence suggesting that they can request a specific assignment.  Rather, MCC assigns the nurses to the open positions, thereby determining to some extent which nurse fills what position.  Moreover, while there was testimony that MCC did not specifically direct the on-job performance or activities of the nurses, Cortez stated that MCC did conducted home visits seeking information from the patient-customers and their parents/guardians, checking up on the nurses' quality of care.  In addition, Rubens testified at the hearing that she was assigned to a nursing supervisor, whom she was to approach in case she confronted any problems or required assistance.  Furthermore, while the nurses were required to buy their own supplies, Ruben's testimony shows that MCC directed the nurses as to what supplier to use.  Rubens also testified that she had received an employee manual on two separate occasions; although Rubens provided her own uniform, the manual required that she wear a white lab coat while on duty.  In addition, Cortez testified that the nurses attended an orientation meeting coordinated by MCC.  From this evidence, a reasonable conclusion can be made that MCC may have exercised at least some degree of control over the nurses, thereby possibly indicating an employer-employee relationship.  

Next, as to factor (3) (the extent of the relative investments of the individual and alleged employer), the court stated that the fact that the nurses supply their own equipment, tools and uniforms clearly indicates an independent contractor status.  However, the court focused solely on the extent of the nurses' investment and failed to compare that to the relative extent of MCC's investment in this business.  The record shows that MCC hired and retains a full-time "in house staff" to oversee and supervise the nurses.  This staff includes a director, "case managers" and "nursing coordinators."  Cortez stated in his affidavit that he works at the office where MCC maintains its "place of business."  Cortez also stated that MCC incurs overhead, which is considered when establishing the nurses' hourly pay rate.  This evidence does not render a clear inference that the extent of the nurses' relative investment, as compared to that of MCC, is somehow greater and therefore would support a finding of independent contractor status.

With respect to factor (5) (permanency of the relationship), the trial court stated that "the facts on the whole" demonstrated a lack of permanency and, thus, indicate that the nurses are independent contractors.  While Cortez testified that most nurses do not stay with MCC "for a long time" and that the nurses can work with more than one agency and/or patient, this conflicts with other evidence presented indicating that more permanent relationships may well have existed between MCC and some of the nurses.  For example, Rubens testified, and MCC's employment records included in the record on appeal show, that Rubens worked for MCC for more than a 

2½-year period.  What is more, Rubens spent that entire time working for only one patient.  Rubens also testified that she worked for MCC on a full-time basis.  In addition, MCC's employment records indicate that several other nurses worked for MCC for extended periods of a year or more, as did Rubens.  Based on this conflicting evidence, it cannot be said that the factor of permanency categorically favored a determination that the nurses were independent contractors.

 Finally, as to factor (6) (the skill required in the claimed independent operation), we note that the trial court found that because the nurses are obligated to maintain their own licensing and do not receive training or instruction from MCC, this indicates an independent contractor status.  We do not deny that nursing requires a high degree of specialized skill and training, which, in the instant case, the nurses obtained independent of MCC.  However, in 
Brock
, which presented a similar situation involving nurses and a referral agency, the court 
noted that skill alone may not automatically indicate independent contractor status.  See 
Brock
, 840 F.2d at 1060.  In evaluating this factor, the 
Brock
 court concluded that to exhibit independent contractor status, not only should the individual possess skill, but should also be able to use that skill in an "independent way," without the aid of the alleged employer.  See 
Brock
, 840 F.2d at 1060.  Because the nurses in 
Brock
 depended entirely on the alleged employer's referrals to find job assignments, the fact that the nurses were skilled professionals was negligible in evaluating their employment status.  See 
Brock
, 840 F.2d at 1060.  As in 
Brock
, the nurses in the instant case possess technical skill as such, but they depend on MCC for their job assignments.  This contradicts an assertion that these nurses use their skills in a way independent of MCC.  Rather, the nurses work only if their names are on MCC's referral roster and only when MCC finds open positions to which it can, and chooses to, refer them.  There is no evidence that the nurses locate their own client-patients; rather, it is MCC that provides job availability.  See 
Richardson v. Genesee County Community Mental Health Services
, 45 F. Supp. 2d 610, 614 (E.D. Mich. 1999) (citing 
Brock
, 840 F.2d at 1060, and concluding that although registered nurses are skilled workers, this is not in and of itself indicative of independent contractor status; in point of fact, that the nurses at issue did not "exercise any initiative in locating clients" indicated employee, rather than independent contractor, status).  Thus, the evidence presented before the trial court with respect to the nurses' skill indicates that different inferences may be drawn in concluding whether this factor supports employee status or independent contractor status.

Thus, it would seem that factor (2) (integral part of business) and factor (4) (opportunity for profit and loss) are consistent with employee status.  Factor (3) (relative investment), upon further exploration, would likewise prove to be most consistent with employee status.  While factors (1) (control), (5) (permanency) and (6) (skill) may be more indicative of independent contractor status, they do not conclusively establish that fact, but leave room for counter-inferences to be drawn.  Thus, each of the six factors individually, and all the more so in their totality, compels the conclusion that there are genuine issues of material fact as to the status of the nurses under the Act, which are inappropriate for summary adjudication.
  

CONCLUSION

For the foregoing reasons, we reverse the holding of the trial court and remand this cause for further proceedings.

Reversed and remanded.

McNULTY, J., and O'MALLEY, J., concurring.

FOOTNOTES
1:
The parties agree that on November 13, 2001, MCC and Cortez filed a motion to dismiss pursuant to section 2-619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(9) (West 2000)), as per the oral instruction of a trial judge during a prehearing status conference.  The Department filed a response, asserting that the motion to dismiss should be denied because it was untimely since MCC and Cortez had already filed their answer.  See 
Barber-Colman Co. v. A&K Midwest Insulation Co.
, 236 Ill. App. 3d 1065, 1072 (1992).  MCC and Cortez filed a reply, asking the trial court to treat the motion to dismiss as a motion for summary judgment.  With no objection from the Department, the trial court agreed to treat the motion as one for summary judgment, as we therefore do for purposes of this appeal.